**NATION et al. v. CHISM et al.**

No. 22680. Opinion Filed Dec. 8, 1931.

Rehearing Denied Jan. 12, 1932.

Nowlin, Spielman & Thomas and Conner & Conner, for plaintiffs in error.

J. Berry King, Atty. Gen., Fred Hansen, Asst. Atty. Gen., and Hall & Thompson, for defendants in error.

ANDREWS, J. This is an appeal from a judgment of the district court of Oklahoma county in favor of the defendants in error, defendants in the trial court, against the plaintiffs in error, plaintiffs in the trial court. Hereinafter the parties will be referred to as plaintiffs and defendants.

The trial court sustained a general demurrer to the petition of the plaintiffs and from that order an appeal was taken to this court. There is but one proposition presented by the plaintiffs and that is, that the trial court erred in sustaining the demurrer of the defendants to the petition of the plaintiffs.

The petitioners sought to enjoin the defendants from enforcing the provisions of House Bill No. 23, Session Laws of 1931, commonly called the "Barbers Bill." Among other things the plaintiffs, in their petition, alleged:

"That said purported act of the Legislature was never enacted by the Legislature never became an act of the Legislature, was never approved by the Governor, and is wholly void."

As against a demurrer, a petition must be liberally construed and all of its allegations of fact must be taken as true. If any fact stated therein entitles the plaintiff to any relief the demurrer should be overruled. Schlingman v. Wells, 122 Okla. 275, 254 P. 716. Under that rule the petition in this case stated a cause of action if an action can be maintained to enjoin the enforcement of provisions of an act that was not enacted by the Legislature. If the facts stated in the petition are true, there is no act of the Legislature and the defendants are assuming to act without authority of law. Such is the admission of the defendants by their demurrer. Under the provisions of the act in question, a violator thereof is subject to the payment of a fine of not to exceed $100 for each violation thereof, and

each day's practice of the trade of barbering without compliance with the provisions of the act is made a separate offense. In other words, a barber in a city of over 600 population must refrain from the practicing of his trade, conform to the provisions of the act, or be subject to arrest, fine, trial, and imprisonment for each day that he continues to practice his trade. We are not dealing with an ordinary criminal statute which provides a punishment for the doing of a wrongful act, but with an extraordinary act, which recognizes the lawfulness of the barber trade, but which, for public health purposes, attempts to regulate the carrying on of that trade and which requires performance of conditions on the carrying on of that trade, makes the practicing of the trade without performance of those conditions a misdemeanor, and provides a penalty of a fine of not to exceed $100 for each day the trade is carried on. A literal enforcement thereof would result in the arrest of each of the plaintiffs every day that he attempted to practice his trade of barbering, unless he complied with the terms of the act by doing the things therein required to be done. The plaintiffs allege, and by their demurrer the defendants admit, that the act was never enacted by the Legislature.

Nothing herein said is intended as a determination of whether or not the act is constitutional. We are limiting our consideration of the act to the allegation of the petition hereinabove quoted. If the act was never enacted by the Legislature, it is immaterial whether or not it is constitutional.

The right to practice the trade of barbering is one of the common occupations of life. The barber has a legal right to practice his trade without hindrance. See State ex rel. Sampson v. City of Sheridan (Wyo.) 170 P. 1, and Butchers' Union Slaughter House Co. v. Crescent City Live Stock Co., 28 L. Ed. (U. S.) 385. That that right may be regulated by valid legislation is not disputed. The allegation of the petition is that no regulatory statute was enacted by the Legislature. We quote from 14 R. C. L., page 434, section 136, the following:

"* * * As a void statute affords no protection to those who execute it, such persons may be enjoined from acting thereunder, when there is no adequate remedy at law. The well-recognized exception to the general rule, supported by the great weight of authorities, is that where some irreparable injury will be occasioned to a private individual by the acts of a public officer or board by virtue of some alleged unconstitutional law, courts of equity will take jurisdiction and issue an injunction to restrain the commission of the act complained of."

In support of the text the following cases are cited: Regan v. Farmers' Loan. etc., Co., 154 U. S. 362, 14 S. Ct. 1047, 38 L. Ed. 1014; Scott v. Donald, 165 U. S. 107, 17 S. Ct. 262, 41 L. Ed. 648; Wilson v. Lambert, 168 U. S. 611, 18 S. Ct. 217, 42 L. Ed. 599; Prout v. Starr, 188 U. S. 537, 23 S. Ct. 398, 47 L. Ed. 584; Ludwig v. Western Union Tel. Co., 216 U. S. 146, 30 S. Ct. 280, 54 L. Ed. 423; Louisville, etc., R. Co. v. Garrett, 231 U. S. 298, 34 S. Ct. 48, 58 L. Ed. 299; Ellingham v. Dye, 178 Ind. 336, 99 N. E. 1, Ann. Cas. 1915C, 200; Pennsylvania R. Co. v. Ewing, 241 Pa. St. 581, 88 Atl. 775, Ann. Cas. 1915B, 49 L. R. A. (N. S.) 977; Bradley v. Powell County, 2 Humph. (Tenn.) 428, 37 Am. Dec. 563; Missouri, etc., R. Co. v. Shannon, 100 Tex. 379, 100 S. W. 138, 10 L. R. A. (N. S.) 681; Wadhams Oil Co. v. Tracy, 141 Wis. 150, 123 N. W. 785, 18 Ann. Cas. 779; Benz v. Kremer, 142 Wis. 1, 125 N. W. 99, 26 L. R. A. (N. S.) 842.

The defendants contend that the appeal should be dismissed for failure of the plaintiffs to comply with Rule No. 26 of this court. They say that the plaintiffs seek to attack the trial court's ruling under several specifications, none of which are separately stated or numbered. We do not agree with that statement. The plaintiffs attack the trial court's ruling under one specification, that is, that there was error in sustaining the demurrer of the defendants to the petition of the plaintiffs. The many reasons set forth by the plaintiffs as to why the trial court should not have sustained the demurrer are but parts of one specification of error within the meaning of Rule No. 26, supra.

The defendants contend that the appeal should be dismissed for the reason that the final action of the trial court was to dismiss the action and that the plaintiffs have not appealed from the order dismissing the cause, but from the order sustaining the demurrer to the plaintiffs' petition.

This court has frequently held that an appeal may be taken from an order sustaining a demurrer to a petition. Ashley Silk Co. v. Oklahoma Fire Ins. Co., 33 Okla. 318, 125 P. 449; Knebel v. Rennie, 87 Okla. 136, 209 P. 414. The defendants contend that in those cases the cause was not dismissed. No authority is cited as to that distinction.

We know of none. Under the provisions of section 780, C. O. S. 1921, the Supreme Court may reverse, vacate, or modify an order sustaining a demurrer to a petition. "Any of the following orders" therein refers to any of three subdivisions thereinafter stated. The first subdivision refers to a final order; the second subdivision refers, among other things, to an order overruling a demurrer. An appeal may be had from either. It is not necessary that there be a dismissal of the action before an appeal to the Supreme Court may be taken from an order sustaining a demurrer to a petition, where the pleader elects to stand on the petition, and on appeal it is not necessary to allege error in dismissing the action where the action of the trial court in sustaining the demurrer to the petition is alleged to be erroneous.

The defendants contend that the plaintiffs have an adequate and speedy remedy at law. They do not state what that remedy is. If the plaintiffs have such a remedy, we do not know what it is. The defendants, to a considerable extent, rely upon the decision of the Territorial Supreme Court in Thompson v. Tucker, 15 Okla. 486, 83 P. 413, and the decision of this court in Turner et al. v. City of Ardmore, 41 Okla. 660, 130 P. 1156. The rule stated in the latter case and other cases to the same effect is overruled in so far as it is in conflict with the rule herein stated and we decline to follow the holding in the territorial case. To do so would require the plaintiffs to discontinue a lawful occupation, conform to the provisions of the act in question, or subject themselves to arrest, with all the trouble and inconvenience incident thereto, until a determination of a criminal prosecution and a decision by the county court or by the Criminal Court of Appeals as to the validity of the act could be had. To abandon a lawful occupation is certainly not an adequate and speedy remedy at law. To pay out money, as required by the provisions of the act, to individuals unauthorized to collect the same as a condition to the carrying on of a lawful occupation is not an adequate and speedy remedy at law. If the plaintiffs have any remedy at law, it is to defend the criminal prosecutions which, under the admitted allegations of the petition, are to be instituted against them.

Under the provisions of section 2, art. 2, of the Constitution of Oklahoma, all persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry. Where an attempt is made by any individual, without lawful authority, to deprive them of any of those rights, the courts of justice of this state are open to them, and speedy and certain remedy must be afforded them for such a wrong. Section 6, art. 2, of the Constitution. This court will not close its ears when citizens of the state, compelled to abandon a lawful occupation, pay out money to prevent prosecution, or submit to arrest, plead that there is no authority for such interference with their rights and that the asserted authority therefor was never enacted by the Legislature.

We are aware of the fact that many courts hold that injunctive relief will not be granted to prevent the enforcement of a criminal statute. Many of those decisions are based on statutes and procedure not applicable in Oklahoma. The distinctions between actions at law and suits in equity have been abolished in Oklahoma. Section 178, C. O. S. 1921. Section 405, C. O. S. 1921, provides for injunctive relief not only to prevent "injury to the plaintiff," but injury to "the plaintiff's rights respecting the subject of the action." Under the provisions of that section, it cannot be said that injunctive relief in Oklahoma is limited to protection of property. Notwithstanding the statements heretofore made by this court in some cases, we hold that the Legislature intended by the provisions of section 405, supra, to provide for injunctive relief against injuries to a plaintiff as well as injuries to a plaintiff's property. The case at bar furnishes sufficient reason for the enactment of such a legislative provision. Workmen engaged in the carrying on of a lawful occupation are threatened with arrest for refusal to conform to the demands of individuals. They seek relief at the hands of a court of justice and ask that such interference with their rights be enjoined. They assert as a reason therefor that the defendants are without authority to act for the reason that the legislative act under which they claim authority was never enacted by the Legislature. They are entitled to the relief sought where the defendants by a demurrer admit that they are without authority to act.

We quote from Fitzhugh v. City of Jackson, 132 Miss. 585, 97 So. 190, wherein that court said:

"While there are some authorities to the contrary, the great weight of authority and the better-reasoned cases hold that, where a municipal ordinance is void and its provisions are about to be enforced, or are being enforced, any person who is injuriously affected thereby, either in his person or the

use of his property, may go into a court of equity to have the enforcement of the ordinance stayed by injunction."

See, also, San Diego Tuberculosis Association. v. City of East San Diego (Cal.) 200 Pac. 393.

In the language of Yee Gee v. City and County of San Francisco, 235 Fed. 757,

"If the enforcement or threatened enforcement of the act involves or will involve a direct invasion of property rights, equity will interfere to restrain the perpetration of the wrong, notwithstanding the enforcement is through a criminal prosecution. Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169, and cases there cited.

"The present case, I think, falls within this exception. The right to labor or earn one's livelihood in any legitimate field of industry or business is a right of property, and any unlawful or unreasonable interference with or abridgment of such right is an invasion thereof, and a restriction of the liberty of the citizen as guaranteed by the Constitution. Lochner v. New York, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133. That the industry here involved is in its essential nature a perfectly harmless, legitimate, and even necessary one, as viewed in its relation to our domestic and social economy, no question is or can be made. In re Hong Wah (D. C.) 82 Fed. 623; In re Quong Woo (C. C.) 13 Fed. 231; In re Tie Loy (C. C.) 26 Fed. 611; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220. If, therefore, the ordinance, as a whole, or in either of the particular features attacked, be in contravention of plaintiff's rights under the Constitution, its enforcement as to him in such obnoxious respect would in legal contemplation constitute an unauthorized invasion of his property."

Mr. Justice Field, concurring in the decision of the Supreme Court of the United States in the case of Butchers' Union Slaughter-House & Livestock Landing Co. v. Crescent City Livestock Landing & Slaughter-House Co., 111 U. S. 746, 28 L. Ed. 585, said:

"The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves and have been followed in all communities from time immemorial, must, therefore, be free in this country to all alike upon the same conditions. The right to pursue them, without let or hindrance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright.

"It has been well said that, 'The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper.' Adam Smith, Wealth of Nations, bk. 1, ch. 10."

Mr. Justice Williams, speaking for the court in Yale Theater Co. v. City of Lawton, 35 Okla. 444, 130 P. 135, said:

"It also seems to be settled that equity will restrain, by injunction, criminal proceedings under an invalid ordinance, which, if allowed to proceed, would destroy property rights and inflict irreparable injury"

—and cited a long list of authorities in support of that rule.

In the Law of Injunctions, by Lewis & Spelling, section 110, the authors state:

"That the bare privilege of working for wages, doing or conducting a business, or pursuing one's occupation or trade is a property right, or any thing more or other than a privilege, must be conceded to be legal doctrine, by all who will take the trouble to investigate the subject. And yet that doctrine, by repeated and cumulative adjudications, has become firmly established in the jurisprudence of the United States.

"Broadly stated, this right to conduct one's business, without wrongful or injurious interference of others is asserted to be property, or property right, which will be protected, when necessary, by injunctive process. And the doctrine has been approved by the Supreme Court of the United States. The doctrine has two aspects: First, as related to business, or the right to do or continue to do business, that it is a property right; and, secondly, that the right to labor or to seek employment, or to continue the relation of employer and employee, is also a property right. And injunctions are now often granted to protect both."

In section 10 the same authors state:

"It is equally clear that the wrong about to be done a party affecting his property and civil rights should be stayed or prevented, where he has no adequate legal remedy, notwithstanding that the wrongful act or conduct complained of possesses elements of criminality. It follows that a court of equity will not withhold preventive relief

because such act is criminal, it also appearing that the act or conduct will result in a violation of property rights and that the applicant for relief has no other adequate remedy."

The judgment of the trial court is reversed and the cause is remanded to that court, with directions to overrule the demurrer of the defendants to the petition of the plaintiffs and for further procedure not inconsistent herewith.

HEFNER, CULLISON, and KORNEGAY, JJ., concur. LESTER, C. J., concurs specially. CLARK, V. C. J., and SWINDALL and McNEILL, JJ., dissent. RILEY, J., not participating.

---

LESTER, C. J. (concurring). I concur in that part of the opinion which announces the rule to the effect that a general demurrer to the petition admits all of the facts specifically set forth in the petition. Herein it is shown that the plaintiffs below stated and alleged:

"That said purported act of the Legislature was never enacted by the Legislature, never became an act of the Legislature, was never approved by the Governor and is wholly void."

The defendants, for the purpose of said demurrer, admitted the statement in plaintiffs' petition that said purported act of the Legislature never became an act of the Legislature and was never approved by the Governor and is wholly void. In my judgment, the petition to this extent stated a cause of action.

---

CLARK, V. C. J. (dissenting). One of the allegations in the petition for injunction in the court below was as follows:

"That said purported act of the Legislature was never enacted by the Legislature, never became an act of the Legislature, was never approved by the Governor and is wholly void."

The majority opinion holds, for the purpose of the demurrer, that said allegation was sufficient to state a cause of action. This holding requires the trial court to admit evidence to determine the validity of the act in question. This court takes judicial knowledge of the published acts of the Legislature, certified by Secretary of State. It also takes judicial knowledge of House Bill No. 23, Session Laws 1931, and of the original and enrolled bill filed in the office of the Secretary of State, which bill shows the following:

"Passed by the House of Representatives this 10th day of March, 1931.
    "Robt. C. Graham,
    "Acting Speaker of the House of Representatives."

"Passed by the Senate this the 11th day of March, 1931.
    "Robert Burns,
    "President of the Senate."

"Approved by the Governor of the State of Oklahoma on this the ———— day of ——————, 1931.

---

    Governor of the State of Oklahoma.

"(This act was not approved by the Governor.)
    "Luther E. Green,
    "Vice Chairman Committee on Enrolled and Engrossed Bills."

Section 28 of article 5 of the Constitution of Oklahoma provides:

"The Senate shall, at the beginning of each regular session and at such other times as may be necessary, elect one of its members President pro tempore, who shall preside over its deliberations in the absence or place of the Lieutenant Governor; and the Senate shall provide for all its standing committees and, by a majority vote, elect the members thereof."

Section 29 of article 5 of the Constitution of Oklahoma provides:

"The House of Representatives shall, at the beginning of each regular session and at such other times as may be necessary, elect one of its members Speaker."

Section 35 of article 5 of the Constitution of Oklahoma provides:

"The presiding officer of each House shall, in the presence of the House over which he presides, sign all bills and joint resolutions passed by the Legislature, immediately after the same shall have been publicly read at length, and the fact of reading and signing shall be entered upon the journal, but the reading at length may be dispensed with by a two-thirds vote of a quorum present, which vote, by yeas and nays, shall also be entered upon the journal."

Section 15 of article 6 of the Constitution of Oklahoma provides that the Lieutenant Governor shall be President of the Senate, so it can be seen by section 28 of article 5 that the President pro tempore of the Senate shall preside over the deliberations of the Senate in the absence of the Lieutenant Governor. This bill shows on its face that it passed the Senate on the 11th day of March, 1931, was signed by Robert Burns,

56

President of the Senate, who was the presiding officer thereof.

The Constitution provides in the case of the Senate that the Lieutenant Governor and the President pro tempore shall be the presiding officer; however, in case of the House I find no constitutional provision as to who shall be the presiding officer of the House.

Section 29, supra, of the Constitution provides that the House of Representatives shall elect one of its members Speaker; but does not even by implication provide that the Speaker shall be the presiding officer of the House; however, I will take judicial knowledge of the fact that the Speaker is usually the presiding officer of the House. There being no constitutional inhibition against it, the House may perform its duties with any member presiding and any member of the House purporting to be a presiding officer can sign a bill that has passed the House, as the bill in question here was signed by Robt. C. Graham, acting Speaker of the House of Representatives, which makes it a valid act of the Legislature.

Taking judicial knowledge of the acts of the Legislature filed with the Secretary of the State, I find many of them were signed by members of the House as acting Speaker. Many of them are signed by members of the Senate as acting President of the Senate or President pro tempore. To permit a litigant to question the validity of a bill by going behind enrolled bill filed in the Secretary of State's office and permit the litigant to show by evidence that the man who signed as a presiding officer was not in fact a presiding officer, would permit an attack on all bills enacted by the Legislature of Oklahoma that were signed as acting Speaker or as acting President pro tempore of the Senate, and would create confusion in the administration of the government in Oklahoma and lay open to attack many laws enacted by the Legislature.

Section 11 of article 6 of the Constitution provides in part as follows:

"If any bill or resolution shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the Governor. No bill shall become a law after the final adjournment of the Legislature, unless approved by the Governor within 15 days after such adjournment."

This court must presume that the Legislature presented this bill to the Governor in compliance with the Constitution of Oklahoma and that the same was not returned by the Governor within five days and that it became a law without the signature of the Governor. To determine otherwise, the trial court in the instant case must go behind the records in the Secretary of State's office to determine the same, must resort to the journals of the House and Senate and to such other testimony as would determine this fact. With this I cannot agree.

The allegation in the petition which is held sufficient to state a cause of action by the majority opinion is:

"That said purported act of the Legislature was never enacted by the Legislature, never became an act of the Legislature"

—states a mere conclusion and not a fact which would state a cause of action.

In the case of Lynch v. United States, 13 Okla. 142, 73 Pac. 1095, the first paragraph of the syllabus reads as follows:

"A petition by the United States to annul a patent for fraud, must, under our code practice, contain all the material averments necessary to constitute a good bill in equity under the chancery practice."

Also see Bardick v. Dillon, 7 Okla. 535, 54 P. 785. In 49 C. J. par. 142, page 137 thereof, it is said:

"With respect to form, the test is whether the declaration, complaint or petition clearly states the nature, basis, and extent of the claim or demand which is asserted, so that defendant may be fully informed thereof and enabled to prepare his defense and not be misled in such preparation."

In 21 R. C. L. at page 440, sec. 5, under the head of "Nonpleadable Matters," it is stated:

"It is a well settled rule that legal conclusions are not to be pleaded, for it is the duty of the courts to declare the conclusions, and of the parties to state the premises. The allegation of a conclusion of law raises no issue, need not be denied, and its truth is not admitted by a demurrer to the complaint containing it."

The statement in plaintiffs' petition:

"That the purported act of the Legislature was never enacted by the Legislature, never became an act of the Legislature"

—is a statement of law which under the well-established rules of all courts is not admitted by the demurrer.

The further allegation in plaintiffs' petition, "was never approved by the Governor and is wholly void," fails to state a cause of action for the reason section 11, art. 6,

supra, provides that a bill may become a law of this state without the approval of the Governor, and the mere statement "that the act was not approved by the Governor" does not make the same invalid, for the reason that it is provided by the Constitution that a bill may become a valid law without the approval of the Governor.

This law is a valid law upon its face, and this court has held in Atchison, T. & S. F. Ry. Co. v. State, 28 Okla. 94, 113 P. 921, that you could not go behind the enrolled bill to determine the validity of the same. The first paragraph of the syllabus reads as follows:

"When an enrolled bill has been signed by the Speaker of the House and by the President of the Senate, respectively, in the presence of those bodies immediately after the bill has been read publicly at length, and the same has been approved by the Governor and deposited in the office of the Secretary of State, it is not competent to show from the journals of the House that the act so authenticated, approved and deposited did not pass in the form in which it was signed by the presiding officers and approved by the Governor."

In this syllabus it is stated that the bill was signed by the Speaker of the House and by the President of the Senate, respectively; no doubt the bill under consideration was so signed, but section 35 of art. 5 of the Constitution provides in part:

"The presiding officer of each House shall, in the presence of the House over which he presides, sign all bills and joint resolutions passed by the Legislature. * * *"

Beginning at page 100 of the Okla. Report, this court quoted at length from the case of Field v. Clark, 143 U. S. 649, and other cases supporting this rule as follows:

"The question now under consideration was first directly presented to the Supreme Court of the United States for determination in Field v. Clark, 143 U. S. 649. In that case the validity of an act of Congress was questioned upon the ground that there had been omitted from the engrossed act, as attested by the Vice President and the Speaker of the House, as approved by the President, and as deposited with the Secretary of State, a section that was contained in the act when it passed the two houses of Congress, and it was sought to establish this fact by reference to the journals of the two houses of Congress; but it was held that the act could not be impeached in this way. Section 5, art. 1 of the federal Constitution provides that:

" 'Each house shall keep a journal of its proceedings and from time to time publish the same, except such parts as may in their judgment require secrecy, and the yeas and nays of the members of either house on any question shall, at the desire of one-fifth of those present, be entered on the journals.'

"The court, speaking through Mr. Justice Harlan of the relative weight that shall be given to the journal thus required to be kept by the houses and to the engrossed act, said:

" 'The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the President has no authority to approve a bill not passed by Congress, an enrolled act in the custody of the Secretary of State, and having the official attestations of the Speaker of the House of Representatives, of the President of the Senate, and of the President of the United States, carries, on its face, a solemn assurance by the legislative and executive departments of the goverment, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated, leaving the courts to determine, when the question properly arises, whether the act so authenticated, is in conformity with the Constitution."

"The doctrine of the foregoing case has been either approved or followed in the following cases from the Supreme Court: United States v. Ballin, 144 U. S. 3; Lyons v. Woods, 153 U. S. 662; Hardwood v. Wentworth, 162 U. S. 558.

"Referring to the dangers which may attend the application of this rule and the abuses to which it might be subjected, the court, in Field v. Clark, said:

" 'It is admitted that an enrolled act, thus authenticated, is sufficient evidence of itself —nothing to the contrary appearing upon its face—that it passed Congress. But the contention is, that it cannot be regarded as a law of the United States if the journal of either fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses, and approved by the President. It is said that, under any other view, it becomes possible for the Speaker of the House of Representatives and the President of the Senate to impose upon the people as a law a bill that

**58**

was never passed by Congress. But this possibility is too remote to be seriously considered in the present inquiry. It suggests a deliberate conspiracy to which the presiding officers, the committes on enrolled bills and the clerks of the two houses must necessarily be parties, all acting with a common purpose to defeat an expression of the popular will in the mode prescribed the Constitution. Judicial action based upon such a suggestion is forbidden by the respect due to a co-ordinate branch of the government. The evils that may result from the recognition of the principal that an enrolled act, in the custody of the Secretary of State, attested by the signatures of the presiding officers of the two houses of Congress, and the approval of the President, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them.'

"And to the same point, Mr. Justice Sawyer, in Sherman v. Story, supra, said (30 Cal. 253):

"'Better, far better, that a provision should occasionally find its way into the statute through mistake, or even fraud, than that every act, state and national, should at any and all times be liable to be put in issue and impeached by the journals, loose papers of the Legislature, and parol evidence. Such a state of uncertainty in the statute laws of the land would lead to mischief absolutely intolerable.'"

This court in Johnson v. Grady County, 50 Okla. 188, 150 P. 497, in the 9th, 10th, and 11th paragraphs of the syllabus, said:

"(9) The rule obtains in this state that an enrolled bill on file in the office of the Secretary of State imports absolute verity, and the same cannot be impeached by the legislative journals, and, when such an act is called into question, the courts will look to the enrolled bill only. This is the rule where the bill is attached for some irregularity; but when the very existence of the bill is questioned, based upon the fact that the enrolled bill cannot be produced, the court will look to the journals for the information."

"(10) The existence of a statute cannot be tried as a question of fact, but must be determined as one of law by the court."

"(11) The courts must take judicial notice of what is, and what is not, the statute law of the state."

It is my view that the existence of the statute in question cannot be tried as a question of fact, but should and must be determined as one of law by this court; and this court has many times held that it must

take judicial notice of what is and what is not the statute law of this state, otherwise no law in this state could be enforced without the court at the same time trying out the facts to determine the validity or invalidity of the act of the Legislature.

An examination of the decisions from the different states shows that there is a division of opinion on this question; however, I believe the rule announced by this court, consistently followed to this date, should be followed in the case at bar.

The rule announced by the Supreme Court of the United States was followed by this court on January 24, 1911, and has been followed to this date. I am of the opinion that this court should now, in the case before it, follow the rule so announced.

To go behind the enrolled and engrossed bill filed with the Secretary of State would permit an attack on all laws in the state of Oklahoma, and if a different rule is followed, would no doubt invalidate many of them. It may be that some bills were fraudulently passed by the Legislature; I do not mean to intimate that the present bill in question was so passed, but it would be far better that occasionally a law should pass the Legislature that would not conform to all requirements than that all laws passed by the Legislature would be subject to an attack in the courts, creating untold litigation, uncertainty in government, loss of taxes and a condition not contemplated or considered by the Legislature in enacting the laws of this state.

The House of Representatives and the Senate being one of the branches of this government, equal in its sphere with the judicial branch, and a bill certified to by the presiding officer of the House and Senate, respectively, is entitled to the same consideration, and purports the same verity as an opinion, judgment, or order of this court signed by the Chief Justice of the court or an opinion of this court filed in any case.

Could it be said that a bill purporting to be approved by the Governor could later be questioned in a court on the theory that the same was not the signature of the Governor or that the Governor had some ulterior motive in approving the same, amounting to fraud.

Section 1 of article 4 of the Constitution of Oklahoma provides:

"The powers of the government of the state of Oklahoma shall be divided into three separate departments; The legislative, executive, and judicial, and except as provided in

this Constitution, the legislative, executive, and judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

It can be seen that this section of the Constitution divides the powers of our government into three separate departments, and that neither shall exercise the powers properly belonging to either of the others.

It was held in the case of Taylor v. Beckham (Ky.) 56 S. W. 177, 49 L. R. A. 258, that legislative journals purporting to contain the records of the proceedings of the Legislature on trial of contested elections for Governor or Lieutenant Governor cannot be impeached in the courts for fraud. The courts cannot invade a co-ordinate and independent department of government. In Field v. Clark, supra, the Supreme Court of the United States said:

"The views we have expressed are supported by numerous adjudications in this country, to some of which it is well to refer. In Pangborn v. Young, 32 N. J. Law (3 Vroom) 29, 37, the question arose as to the relative value, as evidence of the passage of a bill, of the journals of the respective houses of the Legislature and the enrolled act authenticated by the signatures of the speakers of the two houses and by the approval of the Governor. The bill there in question, it was alleged, originated in the House and was amended in the Senate, but, as presented to and approved by the Governor, did not contain all the amendments made in the Senate. Referring to the provision in the Constitution of New Jersey, requiring each house of the Legislature to keep a journal of its proceedings—which provision is in almost the same words as the above clause quoted from the federal Constitution—the court, speaking by Chief Justice Beasley, said that it was impossible for the mind not to incline to the opinion that the framers of the Constitution, in exacting the keeping of the journals, did not design to create records that were to be the ultimate and conclusive evidence of the conformity of legislative action to the constitutional provisions relating to the enactment of laws. In the nature of things, it was observed, these journals must have been constructed out of loose and hasty memoranda made in the pressure of business and amid the distractions of a numerous assembly. The Chief Justice said: 'Can any one deny that, if the laws of the state are to be tested by a comparison with these journals, so imperfect, so unauthenticated, that the stability of all written law will be shaken to its very foundation? Certainly no person can venture to say that many of our statutes, perhaps some of the oldest and most important, those which affect large classes of persons or on which great interests depend, will not be found defective, even in constitutional particulars, if judged by this criterion. * * * In addition to these considerations, in judging of consequences, we are to remember the danger under the prevalence of such a doctrine to be apprehended from the intentional corruption of evidences of this character.. It is scarcely too much to say that the legal existence of almost every legislative act would be at the mercy of all persons having access to these journals; for it is obvious that any law can be invalidated by the interpolation of a few lines or the obliteration of one name and the substitution of another in its stead. I cannot consent to expose the state legislation to the hazards of such probable error or facile fraud. The doctrine contended for on the part of the evidence has no foundation, in my estimation, on any considerations of public policy.' The conclusion was, that upon grounds of public policy, as well as upon the ancient and well settled rules of law, a copy of a bill bearing the signatures of the presiding officers of the two houses of the Legislature and the approval of the Governor, and found in the custody of the Secretary of State, was conclusive proof of the enactment and contents of a statute, and could not be contradicted by the legislative journals or in any other mode."

I am of the opinion that the courts of this state should not invade the co-ordinate and independent departments of government by inquiring into the proceedings or the vote or the validity or motives of members of the Legislature in enacting a law. It was the intention of the makers of our Constitution to keep the legislative, judicial, and executive departments different and distinct, and each should operate in its sphere without an attempt to perform the duties of the other. To say that this court can go behind an enrolled and engrossed bill filed in the Secretary of State's office is to say that it can invade the Legislature and determine mere matters of procedure.

I am of the opinion that the demurrer to plaintiffs' petition, seeking relief in a court of equity on the grounds that House Bill No. 23 never became an act of the Legislature, was properly sustained and the judgment of the trial court sustaining the demurrer should be affirmed.

I am authorized to announce that Justice SWINDALL concurs in this dissent.